UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

URSULA MAYES, EVA PEPAJ, JAIME
EDMONDSON, JAIME MIDDLETON,
JENNIFER ARCHULETTA, RACHEL
KOREN, TIFFANY TOTH, and VIDA
GUERRA,

                           Plaintiffs,           **REPORT AND RECOMENDATION**

    -against-                           1:16-CV-06533 (NGG) (ST)

SUMMIT ENTERTAINMENT
CORPORATION d/b/a GENTLEMEN'S
QUARTERS and PHILLIP TRICOLLA

Defendants.
-----------------------------------------------------------X

**TISCIONE, United States Magistrate Judge:**

      Plaintiffs allege that the Defendants—owners and operators of a strip club on Long Island—have unlawfully used Plaintiffs' images in social media advertisements. Plaintiffs claim this violated the Lanham Act, 28 U.S.C. § 1051 *et seq.*, and New York's Deceptive Practices Act, New York General Business Law § 349.

      Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Defendants now move to dismiss. This Court recommends that the entirety of Defendants' motion be denied with two exceptions: the Deceptive Practices Act claims brought by Plaintiffs Guerra, Koren, and Toth are time-barred and must be dismissed, and the prayer for punitive damages under the Lanham Act must be dismissed as punitive damages are unavailable under that law.

- 1 -

## BACKGROUND

Plaintiffs are eight professional models and actresses. Am. Compl. ¶¶ 19-16, 24-63 (Dkt. No. 10).[1] They have a variety of public credits to their name. *See* Am. Compl. ¶ 24 (Plaintiff Mayes), ¶ 29 (Plaintiff Pepaj), ¶ 35 (Plaintiff Middleton), ¶ 40 (Plaintiff Edmondson), ¶ 45 (Plaintiff Guerra), ¶ 49 (Plaintiff Koren), ¶ 55 (Plaintiff Toth), ¶ 59 (Plaintiff Archuletta). Some of their more notable credits include:

- Appearances in national magazines such as Maxim, Vogue, and Cosmopolitan for Plaintiff Mayes (Am. Compl. ¶ 24), Playboy for Plaintiff Edmondson (*id*. ¶ 40), and Esquire for Plaintiff Koren (*id*. ¶ 49);

- Appearances on national television shows such as The Tonight Show and The Jay Leno Show for Plaintiff Mayes (*id*. ¶ 24), True Detective for Plaintiff Pepaj (Am. Compl. ¶ 29), Chappelle's Show for Plaintiff Guerra (*id*. ¶ 45), and Shark Tank for Plaintiff Koren (*id*. ¶ 49);

- Appearances in commercials for major products such as Diet Coke for Plaintiff Pepaj (*id*. ¶ 29), Burger King for Plaintiff Guerra (*id*. ¶ 45), and Nike for Plaintiff Koren (*id*. ¶ 49);

- Appearances alongside celebrities such as Kim Kardashian for Plaintiff Koren (*id*. ¶ 49) and Justin Timberlake for Plaintiff Archuletta (*id*. ¶ 59).

Plaintiffs also have significant social media followings. *See* Am. Compl. ¶ 35 (Plaintiff Middleton has "over 2 million social media followers"); *id*. ¶ 55 (same for Plaintiff Toth).

---

[1] As this is a motion to dismiss, this Court must accept all of the allegations made in Plaintiffs' operative complaint to be true. *Giambrone v. Meritplan Ins. Co.*, 2017 WL 2303980, at *3 (E.D.N.Y. Feb. 28, 2017) (citation omitted), *adopted* by, 2017 WL 2303507 (E.D.N.Y. May 24, 2017).

Defendants Summit Entertainment Corp. and Phillip Tricolla own and operate Gentlemen's Quarters, a strip club in Baldwin, New York. *Id*. ¶¶ 17-18. Plaintiffs allege that Defendants misappropriated Plaintiffs' images by altering photographs of Plaintiffs and using them in social media advertisements. *Id*. ¶¶ 19-86. These advertisements were primarily holiday or event themed, such as an advertisement featuring Plaintiff Mayes in a Native American costume before Thanksgiving (*id*. ¶¶ 24-25) or an advertisement featuring Plaintiff Middleton dressed as a cheerleader in advance of the Super Bowl (*id*. ¶ 30); *see also* Am. Compl. Exs. A-H (Dkt. No. 10-1) (selection of the advertisements at issue). According to Plaintiffs, they never gave consent or received remuneration for the advertisements (*id*. ¶¶ 24-63) and Defendants left some of these advertisements on their social media pages for months after they were put on notice of the misappropriations by the filing of this lawsuit (*see id*. ¶ 3, Exs. A-D, H). Plaintiffs do not allege that their names appeared in the advertisements, and the images they have attached to their complaint do not indicate otherwise. *See id*. ¶¶ 19-63, Exs. A-H.

Plaintiffs filed this action in December 2016 alleging eight causes of action, including claims for false endorsement under § 43 of the Lanham Act, 15 U.S.C. § 1125, and Deceptive Trade Practices under New York's Deceptive Trade Practices Act, NYGBL § 349. *See* Compl. ¶¶ 71-136 (Dkt. No. 1). Plaintiffs later removed their six other causes of action when they filed their amended complaint in March 2017. *Compare* Compl. ¶¶ 71-136 *with* Am. Compl. ¶¶ 87-103. In the operative complaint, they request actual damages, an injunction preventing Defendants from using Plaintiffs' images to promote Gentleman's Quarters, punitive damages, and costs and attorney's fees. *Id*. at 20.

Defendants moved to dismiss the amended complaint in April 2017 (*see* Dkt. No. 13), and the Honorable Nicholas G. Garaufis referred the motion to this Court for a report and recommendation.

## DISCUSSION

Upon a motion to dismiss under Rule 12(b)(6), a court must determine whether a complaint makes allegations that, if proven, would entitle a plaintiff to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *accord Sarmiento v. United States*, 678 F.3d 147, 152 (2d Cir. 2012). Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, but "[a] pleading that offers 'labels and conclusions' or 'formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). A complaint may plausibly entitle a plaintiff to relief when there is "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556); *see also Swanson v. Citibank, N.A*., 614 F.3d 400, 404-05 (7th Cir. 2010) ("[T]he plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen.").

There are "'[t]wo working principles'" that guide this analysis: "First, the court must accept all factual allegations as true and draw all reasonable inferences in favor of the non-moving party," and "'[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and this determination is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Giambrone v. Meritplan Ins. Co.*, 2017 WL

2303980, at *3 (E.D.N.Y. Feb. 28, 2017) (quoting *Iqbal*, 556 U.S. at 678, 679), *adopted by*, 2017 WL 2303507 (E.D.N.Y. May 24, 2017).

Defendants have raised arguments for dismissing Plaintiffs' Lanham Act and Section 349 claims in their entirety. *See* Mem. of Law in Supp. of Def.'s Mot. to Dismiss at 4-13 (Dkt. No. 13-1) ("Mem. ISO"); Reply in Supp. of Def.'s Mot. to Dismiss at 1-7 (Dkt. No. 14) ("Reply ISO"). They also argue that Plaintiffs' claims against the individual Defendant, Mr. Tricolla, should be dismissed, as well as the prayer for punitive damages. Mem. ISO at 11-18. Plaintiffs have responded to almost all of Defendants' arguments. *See* Opposition to Def.'s Mot. to Dismiss (Dkt. No. 13-2) ("Opp.").

This Court addresses each argument in turn below.

**I.      Plaintiffs' Claims for of False Endorsement under the Lanham Act.**

Plaintiffs' first claim is for false endorsement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Am. Compl. ¶¶ 87-95. Section 43(a) "is a broad federal unfair competition provision which protects unregistered trademarks similar to the way that section 32(1) of the Lanham Act . . . protects registered marks." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002) (citing *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 209-10 (2000)). Courts have interpreted that section as granting celebrities "a trademark-like interest in their name, likeness, and persona that may be vindicated through a false endorsement claim." *Bondar v. LASplash Cosmetics*, 2012 U.S. Dist. LEXIS 175873, at *17-18 (S.D.N.Y. Dec. 11, 2012) (collecting cases), *recons. den*. 2013 U.S. Dist. LEXIS 352 (S.D.N.Y. Jan. 2, 2013).[2]

---

[2] Defendants contend that this is not the appropriate remedy for Plaintiffs' alleged harms, which Defendants believe is more appropriately defined as a claim for the misappropriation of Plaintiffs' right of publicity under New York Civil Rights Law § 51. *See* Mem. ISO at 14. The protection against

To prove that claim, Plaintiffs must show "that the defendant, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services." *Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008) (citations omitted).

Defendants assert that Plaintiffs have failed to state a claim for false endorsement in two respects: (1) Plaintiffs have failed to allege that they are sufficiently well known such that the misappropriation of their images would likely cause confusion (Mem. ISO at 5-8); and (2) Plaintiffs have failed to allege that the use of their images qualified as an endorsement capable of causing consumer confusion (Mem. ISO at 8-10). Neither argument is persuasive.

---

misappropriation of the right of publicity is indeed meaningfully distinct from the right against trademark infringement. *See* Barbara A. Solomon, *Can the Lanham Act Protect Tiger Woods? An Analysis of Whether the Lanham Act Is A Proper Substitute for A Federal Right of Publicity*, 94 Trademark Rep. 1202, 1206-07 (2004). Whereas trademarks seek to simultaneously protect consumers from deceptive practices and trademark owners from the plundering of their brand's goodwill, the right of publicity only protects the right to control the commercial use of identity. *Id.* This is a meaningful distinction. Because the Lanham Act is in part a consumer protection statute, a plaintiff must prove a likelihood of consumer confusion, whereas in a right of publicity claim the plaintiff need only prove misappropriation. *Id.*

Defendants are correct that the true gravamen of Plaintiffs' claim is infringement on their right of publicity. *See*, *e.g.*, Am. Compl. ¶ 23 ("Defendants' misappropriation occurred without the Plaintiff's knowledge, consent or authorization, at no point did any Plaintiff ever receive any remuneration for Defendants' improper and illegal use of their Images."). But that observation has no legal traction. The cause of action for false endorsement under the Lanham Act is well-accepted in this and other circuits. *See Jackson v. Odenat*, 9 F. Supp. 3d 342, 355 (S.D.N.Y. 2014) (collecting cases). Plaintiffs' alleged harms, therefore, fall squarely within the protections of the Lanham Act. *See Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 306 (D.N.H. 2008) (denying motion to dismiss claims under § 43(a) for the unauthorized use of plaintiff's identity on adult dating website because the use "falls directly" within [the Lanham Act's] language").

**A. Whether Plaintiffs have Sufficiently Alleged Public Recognition Sufficient to Cause Consumer Confusion.**

In assessing the fourth element of a false endorsement claim—the likelihood of confusion—"courts in the Second Circuit apply the eight-factor test laid out in *Polaroid Corp. v. Polarad Elecs. Corp*., 287 F.2d 492 (2d Cir.1961)." *Jackson v. Odenat*, 9 F. Supp. 3d 342, 355 (S.D.N.Y. 2014) (citing *Kelly–Brown v. Winfrey,* 717 F.3d 295, 307 (2d Cir. 2013)), *recons. den.* 9 F. Supp. 3d 342, 368 (S.D.N.Y. 2014). Those factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id*. at 355-56. Application of these factors is not rote, and the factors are neither exhaustive nor dispositive; rather, "a court should keep in mind that the ultimate question is whether the use in its totality would likely confuse consumers." *Id*. at 356.[3] For that reason, courts often adjust the *Polaroid* factors for false endorsement claims, as they are tailored for more run-of-the-mill trademark infringement actions. *Id*. For example, the "quality of the products and 'bridging the gap' are often not considered." *Id*. (citing *Standard & Poor's Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir.1982)). Furthermore, "the 'mark' is the plaintiff's persona and the 'strength of the mark' refers to the level of recognition that the plaintiff has among the consumers to whom

---

[3] The parties dispute whether the question is consumer confusion or celebrity status. *Compare* Mem. ISO at 5-8 *with* Opp. at 7-10. But those two questions are obverse; the use of a person's persona cannot cause confusion unless the public recognizes the plaintiff to some degree. *See Rubio*, 2014 WL 6769150, at *3 (S.D.N.Y. Nov. 12, 2014). Thus, there is no bright line level of "celebrity" necessary to sustain a claim for false endorsement; rather, all that is necessary is that the plaintiff's "identity carries some 'level of consumer recognition.'" *Id*. (quoting *Bondar*, 2012 U.S. Dist. LEXIS, at *27).

the advertisements are directed." *Id.* (citing *Bruce Lee Enters. LLC v. A.V.E.L.A., Inc.,* 2011 WL 1327137, at *20) (S.D.N.Y. Mar. 31, 2011).

This standard imposes a high bar on Defendants' motion to dismiss, as normally "the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990). To prevail, Defendants must show that, assuming the facts stated in the complaint are true, this Court cannot conclude that Plaintiffs' identity carries enough recognition capable of causing confusion. *See Rubio v. Barnes & Noble, Inc.*, 2014 WL 6769150, at *3 (S.D.N.Y. Nov. 12, 2014).

Defendants do not clear that bar, as the complaint's allegations are more than sufficient to support a likelihood of consumer confusion. Plaintiffs allege that they are all "well known professional models." Am. Compl. ¶¶ 9-16. And contrary to Defendants' claim that this is a bald allegation supported only with "a handful of modeling credits," Mem. ISO at 12, Plaintiffs have provided a thorough list including appearances in national magazines and television programs, as well as associations with other celebrities, *see* Am. Compl. ¶¶ 24, 29, 35, 40, 45, 49, 55, 59. It is borderline facetious to suggest that Plaintiffs who purportedly have appeared on the Jay Leno Show, Chapelle's Show, and Shark Tank (*id.* ¶¶ 24, 45, 49), or who have appeared in magazines such as Vogue and Esquire (*id.* ¶¶ 24, 49), or who have publicly appeared with Kim Kardashian (*id.* ¶ 49) have failed to make plausible allegations of public recognition. *See Bondar*, 2012 U.S. Dist. LEXIS 175873, at *28-29 (denying motion to dismiss because the plaintiff had "alleged that she is [a] 'well known' fashion model, who has appeared on catwalks for prestigious designers and been featured in a number of popular fashion magazines"). And the purported extent of Plaintiffs' social media following—as many as two million Facebook followers, seven-hundred thousand Instagram followers, and one-hundred thousand Twitter followers (*id.* ¶¶ 35, 55)—

further corroborates those allegations with factual specifics. *See Lancaster v. Bottle Club, LLC*, 2017 U.S. Dist. LEXIS 109230, at *18 (M.D. Fla. July 14, 2017) ("The Court finds that Plaintiffs have alleged sufficient facts to state a plausible claim for relief. Plaintiffs . . . allege their extensive work history in the modeling industry and their numbers of followers on social media.").

The decisions upon which Defendants rely do not suggest otherwise. For example, in *Pelton v. Rexall Sundown, Inc.*, 2001 U.S. Dist. LEXIS 3825 (S.D.N.Y. Apr. 2, 2001) the court granted summary judgment, finding that there was no issue of material fact because there was "simply no evidence that a consumer who sees this photograph is likely to recognize Plaintiff." *Id.* at *10. While that type of conclusion is appropriate at the summary judgment stage, it is premature on a 12(b)(6) motion. *See*, *e.g.*, *Bondar*, 2012 U.S. Dist. LEXIS 175873, at *29 ("It is unlikely that the public at large is familiar with Bondar. However, it is possible that discovery will indicate that her mark is strong enough to cause a likelihood of consumer confusion."). In the other cases, the plaintiffs either failed to plead that they were well known (*see Rubio*, 2014 WL 6769150, at *3 ("[Plaintiff] fails to allege that her name carries any commercial value analogous to a trademark, or that it is recognized by consumers in the relevant market."); *Albert v. Apex Fitness, Inc.*, 1997 U.S. Dist. LEXIS 8535, at *3-4 (S.D.N.Y. June 12, 1997) ("Plaintiff is a professional model who does not claim that he is well known or a celebrity.")) or the alleged infringement was clearly a parody protected by the First Amendment (*see Roberts v. Bliss*, 229 F. Supp. 3d 240, 252 (S.D.N.Y. 2017) ("Plaintiff here has not plausibly alleged that the advertisement creates consumer confusion because any viewer would understand the ad to be engaged in a parody.")).

Thus, Plaintiffs' allegations are more than sufficient to support the conclusion that their images carry some level of public recognition. *Accord Lancaster v. Bottle Club, LLC*, 2017 U.S. Dist. LEXIS 109230, at *18 (M.D. Fla. July 14, 2017); *Bondar v. LASplash Cosmetics*, 2012 U.S.

Dist. LEXIS 175873, at *25-29 (S.D.N.Y. Dec. 11, 2012); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 306 (D.N.H. 2008).

### B. Whether Plaintiffs have Sufficiently Alleged an Endorsement Causing Confusion.

Defendants next argue that there is no suggestion of endorsement in the advertisements in question because neither "their names or other identifying information . . . appeared in the advertisements." Mem. ISO at 9. They are, in effect, arguing that the mere use of a celebrity's image in an advertisement is legally insufficient to support a claim for false endorsement under the Lanham Act.

That argument rests on two mistakes. First, Defendants take the name of this type of action—false endorsement—much too literally. The name is just that, a name and nothing more; it distinguishes actions like these from more traditional claims of trademark infringement. That skin-deep analysis is shallow, as it "is plain from this statutory text . . . [that] the Act's protection against infringement is not limited to any particular type of consumer confusion." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161-62 (2d Cir. 2016). Rather, Section 43(a) protects against all representations likely to cause confusion "as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(A)(1)(A). Thus, confusion related to any type of association is sufficient in a false endorsement claim. *E.g. Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 627 (S.D.N.Y. 1985) ("The court must . . . decide whether defendant's advertisement creates the likelihood of consumer confusion over whether plaintiff endorsed or was otherwise involved with National Video's goods and services.").

Second, even if "endorsement" were the sole type of confusion capable of satisfying a false endorsement claim, the mere use of a celebrity's image can be sufficient. *Allen*, 610 F. Supp. at 627 n.8 (citing *Negri v. Schering Corp.*, 333 F. Supp. 101, 102, 105 (S.D.N.Y. 1971)) ("When a public figure of Woody Allen's stature appears in an advertisement, his mere presence is inescapably to be interpreted as an endorsement."). Indeed, in *Allen*, the advertisements at issue did not even use Woody Allen's image; they used a lookalike. *Id.* at 617–18.

Defendants rely on two decisions—*Pirone* and *Pelton*—to support their position (Mem. ISO at 8-9), but neither is persuasive. First, *Pirone* appears to stand for, at most, a circuit split over factual questions not at issue here. In that case, the defendant used Babe Ruth's image in a calendar of baseball players and Babe Ruth's estate brought a false endorsement claim. *See Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581 (2d Cir. 1990). The district court granted summary judgment against the estate and the Second Circuit affirmed because it believed that Ruth's image was the *content* of the product, not an indication of *sponsorship*:

> While these pictures of Ruth are in a sense symbols, they in no way indicate origin or represent sponsorship. Photographs of baseball, its players and assorted memorabilia, are the subject matter of the calendar. The pictures of Ruth no more indicate origin than does the back cover's picture of Jackie Robinson stealing home plate. Both covers are merely descriptive of the calendar's subject matter. In neither case would any consumer reasonably believe that Ruth or Robinson sponsored the calendar. Instead, the photographs identify great ballplayers and by so doing indicate the contents of the calendar, not its source.

*Id.* at 584.

Thus, *Pirone* stands at most for the proposition that the Second Circuit—unlike other circuits—believes that false endorsement claims only extend to uses related to advertisement and not to uses related to the content of products. *Compare Pirone*, 894 F.2d 579 at 584 *with Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1072 (9th Cir. 2015) ("Here, the fact

that Marley's image appears directly on Defendants' merchandise does not preclude relief under § 1125(a)."); *but see Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, 2013 U.S. Dist. LEXIS 31155, at *13-16 (S.D.N.Y. Mar. 6, 2013) (denying summary judgment for false endorsement dispute arising from unlicensed use of Bruce Lee's image on t-shirts). Because Defendants used Plaintiffs' identity in advertisements, not merchandise, *Prione*'s holding has no impact here.[4]

*Pelton* is similarly unpersuasive. In that case, the court granted summary judgment on the plaintiff's false endorsement claim because the plaintiff did not appear in the same frame as the product:

> There is nothing about the use of Plaintiff's photograph that implies her endorsement of the CitraLean and Ultra CitraLean products. Her name does not appear anywhere on the label, and the product does not appear in the photograph with her. Rather, she appears sitting on the beach and shielding her face from the sun. Such an image in no way suggests that Defendants attempted to trade on her recognizability in selling CitraLean or Ultra CitraLean.

*Pelton*, 2001 U.S. Dist. LEXIS 3825, at *9 (S.D.N.Y. Apr. 2, 2001). That holding appears to be an outlier, as other cases have found infringement without finding that the celebrity's image was juxtaposed with the product. *See*, *e.g.*, *Bruce Lee Enters., LLC*, 2013 U.S. Dist. LEXIS 31155, at

---

[4] Even if the holding in *Pirone* were broader, there are innumerable ways of distinguishing that case. Some courts have distinguished it on the grounds that the case dealt with an infringement claim brought under Section 32(a), not 43(a), as is the case here. *See Jackson*, 9 F. Supp. 3d at 355 ("[Pirone] reject[s] a celebrity's persona as a trademark for purposes of section 32(a), not section 43(a)."). Others have distinguished it on the grounds that the calendar in *Pirone* featured many baseball players, not just Ruth. *Bruce Lee Enters., LLC*, 2013 U.S. Dist. LEXIS 31155, at *61-62 ("However, *Pirone* is distinguishable from this case: while Babe Ruth's likeness appeared as one of many photographs of baseball players, AVELA's t-shirts feature only an image of Bruce Lee."). Still others have noted that *Pirone* had the unique posture of affirming a grant of summary judgment after the realm of admissible evidence was fixed, rather than the more lenient standard in a motion to dismiss. *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 209 (S.D.N.Y. 2015) (denying motion to dismiss false endorsement claim for infringing uses of Marilyn Monroe's image on merchandise in part because "as noted, *Pirone* occurred at the summary judgment stage"). Any and all of these distinctions apply here.

*61-62. Furthermore, it simply cannot be the case that false endorsement claims require visual juxtaposition in the same frame; an advertisement for Muscle Milk® featuring Dwayne "The Rock" Johnson implies sponsorship, even if he never appears in the same frame as the drink.

Regardless, *Pelton* is inapposite. First of all, the opinion was an order granting summary judgment. 2001 U.S. Dist. LEXIS 3825 at *13. Second of all, the plaintiff in that case failed to offer sufficient evidence that she was well known to the public, which was an independent reason for granting summary judgment. *Id*. at * 10. ("There is simply no evidence that a consumer who sees this photograph is likely to recognize Plaintiff.").

Thus, neither *Pirone* nor *Pelton* suggests that the alleged use of Plaintiffs' images falls outside of uses cognizable under the Lanham Act. To avoid dismissal, Plaintiffs must allege that consumers were likely confused to believe that Plaintiffs were associated with Gentlemen's Quarters in some fashion—whether it be endorsement or employment at the club—and they have done so more than adequately.

## II.      Plaintiffs' Claims of Deceptive Practices under General Business Law Section 349.

Defendants advance two arguments for dismissing Plaintiffs' claims under New York General Business Law § 349. First, they argue that Plaintiffs have failed to allege a public harm recognized by the statute. Mem. ISO at 11-12. Second, they argue that some claims are time-barred. Mem. ISO at 12-13.

This Court recommends that Plaintiffs' claims should not be dismissed in their entirety because consumer confusion—the harm alleged by Plaintiffs—is a sufficiently consumer-directed harm under the Act. This Court does recommend, however, that the Section 349 claims of Plaintiffs Guerra, Koren, and Toth be dismissed, as the entirety of their allegations pertain to conduct that occurred outside the limitations period.

### A.  Whether Plaintiffs have Alleged a Cognizable Harm.

To state a claim under New York's General Business Law § 349, a plaintiff need only allege three elements: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

Nonetheless, Defendants argue that Section 349, as a consumer protection statute, only grants a cause of action to non-consumers for harms that have significant ramifications for the public at large, and that courts routinely dismiss trademark infringement actions alleging mere consumer confusion. Mem. ISO at 11-12. Plaintiffs respond that they have alleged consumer-oriented behavior sufficient to state a claim. Opp. at 12.

Defendants are correct that courts routinely dismiss trademark actions brought under Section 349. But they have not done so uniformly. There is a split in authority, as a minority of courts have allowed trademark actions to proceed under Section 349. *See Pulse Creations, Inc. v. Vesture Grp., Inc.*, 154 F. Supp. 3d 48, 58 (S.D.N.Y. 2015); *see also* Hugh C. Hansen, *Consumer Protection Provisions Prohibiting "Deceptive Practices" and "False Advertising": Proper Vehicles for the Protection of Intellectual Property*, 2 Fordham Intell. Prop. Media & Ent. L.J. 31 (1991) (discussing the budding split in authority).[5]

The majority of courts have found that "trademark infringement claims are not cognizable under . . . § 349 unless there is specific and substantial injury to the public interest over and above

---

[5] Mr. Hansen's article is available at http://ir.lawnet.fordham.edu/iplj/vol2/iss1/3.

the ordinary trademark infringement." *Pulse Creations, Inc.*, 154 F. Supp. 3d at 58.[6] A non-consumer may bring an action for trademark infringement, but "the injury to consumers or the public interest must be more than 'the general variety of consumer confusion that is the gravamen' of such a claim." *Ivy Mar Co. v. C.R. Seasons, Ltd.*, 1998 U.S. Dist. LEXIS 15902, at *22 (E.D.N.Y. Oct. 7, 1998) (quoting *Mastercard Int'l Inc. v. Arbel Corp.,* 1989 U.S. Dist. LEXIS 12433, at *30 (S.D.N.Y. 1989)). The minority, however, have allowed non-consumer's claims to proceed when the alleged public harm was nothing more than consumer confusion. *See*, *e.g.*, *GTFM, Inc. v. Solid Clothing, Inc.*, 215 F. Supp. 2d 273, 302 (S.D.N.Y. 2002) (Cote, J.) ("By intentionally using the '05' designation in a manner confusingly similar to GTFM's use of the '05' trademark, and causing actual confusion, Solid engaged in a consumer-oriented act that was misleading in a material way.").[7]

The only public-oriented harm that Plaintiffs allege is consumer confusion. *See* Am. Compl. ¶ 94 ("Defendants use of Plaintiffs' Images did in fact cause consumer confusion as to Plaintiffs['] employment at and/or endorsement of the Clubs, and the goods and services provided by the Clubs."), ¶ 101 ("Defendants' publication of Plaintiffs' Images . . . was misleading in a

---

[6] *E.g.*, *Jenny Yoo Collection, Inc. v. Watters Design Inc.*, 2017 U.S. Dist. LEXIS 175399, at *35-36 (S.D.N.Y. Oct. 20, 2017) (Broderick, J.); *Sara Designs, Inc. v. A Classic Time Watch Co.*, 234 F. Supp. 3d 548, 557-58 (S.D.N.Y. 2017) (Swain, J.); *Pulse Creations, Inc.*, 154 F. Supp. 3d at 58 (S.D.N.Y. 2015) (Failla, J.); *Romeo & Juliette Laser Hair Removal, Inc.*, 2014 U.S. Dist. LEXIS 133839, at *10-12 (S.D.N.Y. Sep. 23, 2014) (Griesa, J.); *Seat Sack, Inc. v. Childcraft Educ. Corp.*, 2010 U.S. Dist. LEXIS 142577, at *39 (S.D.N.Y. Jan. 22, 2010) (Eaton, J.); *Hi-Tech Pharmacal Co. v. Hi-Tech Pharm.*, 2007 U.S. Dist. LEXIS 48644, at *38-39 (E.D.N.Y. July 5, 2007) (Gold, M.J.); *Sports Traveler, Inc. v. Advance Magazine Publrs., Inc.*, 1997 U.S. Dist. LEXIS 3403, at *7 (S.D.N.Y. Mar. 24, 1997) (Keenan, J.).

[7] *E.g.*, *Casper Sleep, Inc. v. Hales*, 2016 U.S. Dist. LEXIS 150706, at *22-23 (S.D.N.Y. Oct. 20, 2016) (McMahon, J.); *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 643 (S.D.N.Y. 2016) (Rakoff, J.); *Burberry Ltd. & Burberry USA v. Designers Imports, Inc.*, 2010 WL 199906, at *8 (S.D.N.Y. Jan. 19, 2010) (Crotty, J.).

material respect because it created the impression that Plaintiffs were strippers working at the Clubs, or endorsed the Clubs."). Thus, this Court must consider whether mere confusion is sufficient under Section 349 to grant a non-consumer a viable cause of action.[8]

To do so, this Court must first look to whether the New York Court of Appeals has addressed the question. *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005) (citing *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 220–21 (2d Cir.2003)). If New York's highest court has not addressed the question, then this Court "must either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so uncertain that we can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution." *Id*.

This Court has not found, nor have the parties cited, any case from the New York Court of Appeals addressing this question. Thus, this Court will attempt to predict how the New York Court of Appeals would rule.

### 1. The Legislative History of NYGBL 349 and Origin of the Split in Authority.

This issue is similar to one that has played out throughout the country as states enacted their own versions of the Federal Trade Commission Act ("FTCA"). Congress created the FTC in 1914 and later expanded its powers in 1938, thereby outlawing all "deceptive acts or practices" that harmed consumers. *See Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 990-91 (D.C. Cir. 1973) (detailing the legislative history of the FTCA). Congress paired that capacious prohibition

---

[8] Plaintiffs attempt to evade this question by arguing that they have not brought an ordinary trademark dispute but rather a claim for false endorsement. Opp at 12. Even if that were a legally meaningful distinction, the simple fact is that the only consumer-oriented harm they allege is consumer confusion. *See* Am. Compl. ¶¶ 92-93.

with significant safeguards against over-enforcement, only empowering the FTC to bring enforcement actions and limiting such actions to instances that would be in "the interest of the public." *See* 15 U.S.C. § 45(b).

Over time, however, the perception developed that the FTC was unable or unwilling to adequately police deceptive practices. *See* Staci Zaretsky, *Trademark Law and Consumer Protection Law-Deception Is A Cruel Act: "Uniform" State Deceptive Trade Practices Acts and Their Deceptive Effects on the Trademark Claims of Corporate Competitors*, 32 W. New Eng. L. Rev. 549, 567-68 (2010). In response, consumer rights activists pushed for states to adopt "Little FTC Acts," and by the early 1980s all fifty states and the District of Columbia had enacted some form of a Little FTC Act. *Id*.

Although many of the Little FTC Acts initially limited enforcement authority to some government agency, many were amended to add a private right of action. *Id*. at 549-50. Those amendments greatly expanded the pool of potential plaintiffs, thereby stripping away the safeguards against over-enforcement in the FTCA such as political accountability, finite resources, and a statutory public interest requirement. *See* Kevin M. Lemley, *Resolving the Circuit Split on Standing in False Advertising Claims and Incorporation of Prudential Standing in State Deceptive Trade Practices Law: the Quest for Optimal Levels of Accurate Information in the Marketplace*, 29 U. Ark. Little Rock L. Rev. 283, 320 (2007).

Many courts were troubled by the pairing of broad prohibitions with a private right of action. *See* Jeff Sovern, *Private Actions Under the Deceptive Trade Practices Acts: Reconsidering the FTC Act As Rule Model*, 52 Ohio St. L.J. 437, 457-62 (1991) (surveying judicial responses to private actions brought under the Little FTC Acts). In response, they invented limiting principles to restrict the scope of litigation. *See Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 647 F.

Supp. 1026, 1034 (N.D. Ill. 1986) ("Courts, aghast at the apparent breadth of these statutes, have searched for means to limit their reach."). Unfortunately, "these judges have generally, in the words of Justice Cardozo, 'fumble[d] about, feeling in a vague way that some . . . problem is involved, but missing the universal element which would have quickened . . . decision with the inspiration of a principle.'" Sovern, 52 Ohio St. L.J. at 459 (quoting B. Cardozo, Growth of the Law 99-103 (1924)).

This is what happened in New York. The Legislature first enacted Section 349 in 1970, but that law only allowed the Attorney General to bring actions in instances when he or she "shall believe from evidence satisfactory to him [or her] that any person, firm, corporation or association or agent or employee thereof has engaged in or is about to engage in any of the acts or practices stated to be unlawful." NYGBL § 349(b). Later, in 1980, the Legislature extended a cause of action to "any person who has been injured by reason of any violation of this section," thereby allowing such a person to bring an action for the greater of actual damages or fifty dollars, along with treble damages and attorney's fees. *See* NYGBL § 349(h).

That broad language invited the inevitable question: is a non-consumer–such as a business– a "person" who may bring suit for deceptive actions, or is the cause of action limited to consumers? Courts definitively answered that question, deciding that non-consumers may bring actions under Section 349 (*e.g.*, *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)), which is sensible as the statute refers to a "party" rather than a "consumer," as some Little FTC Acts do (*e.g.*, Vt. Stat. Ann. tit. 9, § 2461(b)).

Courts grew concerned, however, as some businesses tacked Section 349 claims onto ordinary commercial disputes. *See*, *e.g.*, *Genesco Entm't, Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 750-1 (S.D.N.Y. 1984). Allowing such claims to proceed would clearly exceed the

statute's purpose and "would alter completely the legal duties governing commercial relationships in New York," *id.*, as the statute does not require proof of intent to deceive—like fraud—and it provides for treble damages in addition to one-way fee shifting. Thus, to stay true to the statute's purpose, Courts have limited standing to conduct that is "consumer-oriented." *See Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).

Again, this is a sensible rule. It strikes an appropriate balance by preventing businesses from tacking deceptive practices claims onto their purely commercial disputes (*e.g.*, *Genesco*, 593 F. Supp. at 751) while also allowing affected businesses to act as vicarious defenders of consumers (*e.g.*, *N. State Autobahn, Inc. v. Progressive Ins. Grp. Co.*, 953 N.Y.S.2d 96, 100-07 (N.Y. App. Div. 2012)).

That limitation was not enough for some, however. In 1988, McKinney's published a practice commentary by Richard A. Givens, a former regional director of the FTC.[9] In that commentary, Mr. Givens invented the principle that trademark infringement actions fall outside of the scope of Section 349. *See* Hansen, 2 Fordham Intell. Prop. Media & Ent. L.J. at 39. Before the commentary, "[m]any courts . . . simply assumed that these sections are applicable" to trademark disputes. *Id.* (collecting cases). Afterwards, "two courts, without independent analysis . . . followed the McKinney's Practice Commentary and refused to apply these sections." *Id.* Since then, Givens' opinion has propagated into the majority view.[10]

---

[9] McKinney's no longer includes Mr. Given's commentary in its published compilations. The most recent edition to include his commentary was the 2004 edition. *See* Richard. A Givens, Practice Commentary, N.Y. Gen. Bus. Law. § 349 (McKinney 2004).

[10] Indeed, each of the cases relied upon by Defendants in their motion papers appear to stem from the uncritical acceptance of Givens' position. For example, they rely on *RCA Trademark Mgmt. S.A.S. v.*

Under that view, consumer confusion is a *de minimis* harm insufficient to satisfy the "consumer-oriented" element for non-consumers. *See Mastercard Int'l, Inc.*, 1989 U.S. Dist. LEXIS 12433, at *30 ("Arbel . . . asserts no injury to consumers or to the public interest, other than the general variety of consumer confusion that is the gravamen of its trademark claim."). With this heightened standard, a non-consumer's claims may proceed so long as "there is specific and substantial injury to the public interest over and above the ordinary trademark infringement." *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 U.S. Dist. LEXIS 133839, at *10-11 (S.D.N.Y. Sep. 23, 2014) (quoting *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 543 (S.D.N.Y. 2012)); *see also Fischer v. Forrest*, 2015 U.S. Dist. LEXIS 4395, at *35 (S.D.N.Y. Jan. 13, 2015) (denying motion to dismiss trademark infringement action because confusion over the origin of a honey harvesting aid allegedly could have caused health problems, ruined harvests, and loss of certifications).[11]

---

*VOXX Int'l Corp.*, 2015 U.S. Dist. LEXIS 111823, at *10 (S.D.N.Y. Aug. 24, 2015). That case cites *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 273-74 (S.D.N.Y. 2003), which cites *Sports Traveler, Inc. v. Advance Magazine Publrs., Inc.*, 1997 U.S. Dist. LEXIS 3403, at *7-8 (S.D.N.Y. Mar. 24, 1997), which cites *EFS Mktg. v. Russ Berrie & Co.*, 836 F. Supp. 128, 136-37 (S.D.N.Y. 1993), which cites *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 78 (E.D.N.Y. 1993), which cites Givens' commentary.

[11] A non-consumer is a party who was not the direct victim of the deceptive conduct but nevertheless suffered harms that the deceptive conduct caused. For example, in *Fischer*, the plaintiff was the inventor and producer of a honey harvesting aid for beekeepers who brought an action against a mail-order business that sold a knock-off version of the product. 2015 U.S. Dist. LEXIS 4395, at *3. The beekeepers who purchased the knockoff were the victims of the deceptive conduct while the plaintiff was an affected non-consumer.

Under the majority's rule, a non-consumer like the plaintiff in *Fischer* must allege that the direct victims of the deception suffered or were likely to suffer harms more significant than mere confusion. *Id.* at *35. Plaintiffs who were the target market for the deception, however, need not allege that the deception posed any risk to health, safety, or a significant public interest. *See, e.g.*, *Koch v. Greenberg*, 626 F. App'x 335, 340 (2d Cir. 2015) ("[G]iven that the defendant provided wine to be sold at auction to other consumers similarly situated to [plaintiff], the consumer-oriented conduct requirement has been met.").

The minority of courts believe that "the elevated requirements that some district courts have apparently engrafted onto the 'consumer-oriented' element of § 349 claims lack a basis in governing New York law." *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 643 (S.D.N.Y. 2016), *recons. denied*, 2016 WL 7188788 (S.D.N.Y. Nov. 17, 2016); *accord* Hansen, 2 Fordham Intell. Prop. Media & Ent. L.J. at 39 (arguing that the text and the purpose of Section 349 support recognizing trademark claims as cognizable harms). Without that heightened standard, mere confusion, such as the placing "into the stream of commerce goods likely to confuse consumers as to their true source of origin . . . . is sufficient to demonstrate an injury under the statute." *Burberry Ltd. v. Euro Moda, Inc.*, 2009 U.S. Dist. LEXIS 53250, at *44-47 (S.D.N.Y. June 10, 2009).

This split in authority has led courts to divergent opinions on identical questions. *Compare id.* ("Burberry has demonstrated that Defendants . . . engaged in a 'consumer oriented act' meant to deceive consumers that the products they sold were authentic Burberry merchandise.") *with DePinto v. Ashley Scott, Inc.*, 222 A.D.2d 288, 289 (NY App. Div. 1995) ("Ashley Scott's claims . . . are based on . . . the alleged use of confusing labels in the manufacture of women's coats which does not pose a significant risk of harm to the public health or interest."). Nevertheless, like other state laws that parallel federal actions, this issue has persisted in federal court without resolution from New York's Court of Appeals. *E.g. Yong Kui Chen v. Wai Yin Chan*, 615 F. App'x 10, 14 (2d Cir. 2015) (surveying split of federal authority over the availability of tip-credit under NYLL).

Thus, this Court must decide whether consumer confusion is too *de minimis* a harm to provide non-consumers with standing under Section 349.

## 2. The Majority's View is Unpersuasive.

After a careful review, this Court respectfully recommends that the District Court follow the lead of the minority. The text, legislative history, and purpose of the statute all weigh against imposing a heightened standard on non-consumers. Though several courts have held otherwise,

those courts do not point to, nor has this Court found, any independent basis for the rule in New York State's law.

The text of the statute outlaws all deceptive conduct, *see* NYGBL § 349(a), which would appear to include trademark infringement claims, *see* Hansen, 2 Fordham Intell. Prop. Media & Ent. L.J. at 38 ("[I]t takes no stretch of the imagination to conclude that deceiving consumers as to the source of the goods that they are buying is a 'deceptive practice.'"). The text may not be dispositive, but there must at least be a reason to depart from such clear language. None of the theories discussed below comes close.

*First*, the majority has assumed that the Legislature's intent was not to include trademark infringement in its consumer protection statute. Mr. Givens, for example, offers that allowing trademark disputes to arise under Section 349 would be "contrary to the history of the statutes." *See* Richard. A Givens, Practice Commentary, N.Y. Gen. Bus. Law. § 349 (McKinney 2004). In support, Givens offers no evidence, and this Court has been unable to find any. *Id.*

The motivating concern behind Section 349 was the perceived inadequacy of the existing set of consumer protection laws targeted at specific conduct. *See* 1968 Report of the Committee on New York State Antitrust Law of the Antitrust Law Section of the New York State Bar Association at 117 (1968), *reprinted in* L. 1970, ch. 43 at 22-30.[12] After a review of existing statutes, the drafters issued a report concluding that the "laws do not fully protect the consumer

---

[12] The Governor's Bill Jacket is an authoritative public record that collects documents that bear on the legislative history of New York's laws. *See Spiro v. Healthport Techs., LLC*, 73 F. Supp. 3d 259, 264 n.1 (S.D.N.Y. 2014). It consists of "material gathered by the Governor's Counsel to assist the Governor in deciding whether to sign a bill passed by the legislature." *City of N.Y. v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 412 (E.D.N.Y. 2007). The Bill Jacket for Section 349 contains a report and study from the Committee on New York State Antitrust Law of the Antitrust Law Section of the New York State Bar Association because that committee drafted the law that was introduced in the legislature. *See* Letter from Seymour D. Lewis to Nelson A. Rockefeller (Feb. 10, 1970), *reprinted in* L. 1970, ch. 43 at 10-11.

from all the varied forms which fraud and deception may take, since these laws are limited to specific types of deceptive conduct." *Id*. To ameliorate this patchwork protection, they drafted Section 349 to be an umbrella covering *all* forms of deceptive conduct. *See id*. ("Its broad language provides public enforcement officials with the flexibility needed to protect both consumers and honest businessmen from the many varied forms of deception, present and future, whether committed intentionally or not."). So significant was this concern that the drafters intentionally chose not to reject other proposed legislation that included enumerated prohibitions so as to avoid the possibility that courts would limit it to acts of a similar nature. *See id*. at 128 ("The Council's . . . . proposed statute with its twelve categories of prohibited conduct does not have the flexibility of . . . the statute proposed herein dealing with the new and varied forms which consumer deception may take."). Included among those specific prohibitions that the drafters deemed to be too narrow were practices likely to cause "confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another." Richard F. Dole, Jr., *Merchant and Consumer Protection: The Uniform Deceptive Trade Practices Act*, 51 Minn. L.Rev. 1005, 1016 (1967).[13]

Given this background, the logical conclusion is that the legislature intended to include trademark infringement in the ambit of Section 349. After all, despite Mr. Given's view, trademark protections are a form of consumer protection. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 782 (1992) (Stevens, J. concurring) (quoting S.Rep. No. 1333, 79th Cong., 2d Sess., 3 (1946)) ("By protecting trademarks, Congress hoped [in part] 'to protect the public from deceit.'"). And there is no reason to think the New York Legislature, the Governor, or anyone else involved in the law's drafting thought otherwise. Indeed, the drafters included trademark protections in their

---

[13] The National Conference of Commissioners on Uniform State Laws has since removed the Uniform Deceptive Trade Practices Act from its proposed legislation, but Mr. Dole's article includes the act in full as proposed in 1967. *See* 51 Minn. L.Rev. at 1015-16.

survey of existing consumer protection laws that they hoped to encompass and expand upon. *See* Study by the Committee on New York State Antitrust Law at 80 n.3, *reprinted in* L. 1970, ch. 43 at 31-73 (surveying laws including those "prohibiting a wide range of offenses against trademarks"). And the Governor's signing memorandum reflects that understanding. *See* L. 1970 ch. 43 at 21 (Section 349 "adds an important new assurance to the people of this State that the goods and services they purchase are as represented."). Other than explicitly including trademark infringement within the ambit of the law—which, ironically, the drafters specifically chose not to do so as to prevent courts from limiting the law with *ejusdem generis*—it is difficult to imagine what more the drafters could have done to make their intentions clear.

  *Second*, the policy concerns for heightened scrutiny of non-consumer standing crumble under modest inspection. For example, Mr. Givens focuses on the inappropriate nature of one-way attorney's fee shifting in trademark disputes, but that concern is unfounded as awards of attorneys' fees under the statute are discretionary. *See Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 54 (2d Cir. 1992). Likewise, the concern that actions for mere confusion will open the floodgates to actions unrelated to consumer protection is baseless as the "requirement that the consumer-oriented conduct be materially misleading limits the availability of section 349 (a) to cases where the deception pertains to an issue that may bear on a consumer's decision to participate in a particular transaction." *N. State Autobahn, Inc.*, 953 N.Y.S.2d at 102 (N.Y. App. Div. 2012). Thus, a plaintiff by definition cannot prevail without proving that deception is likely to misdirect consumers' purchases, which is precisely the harm that the statute seeks to prevent. *Id*.

  *Third*, although courts in the majority have justified their position by arguing that non-consumers must allege consumer-oriented harm "which would trigger FTC intervention under 15

U.S.C.A. § 45," *Horn's, Inc. v. Sanofi Beaute, Inc.*, 963 F. Supp. 318, 328 (S.D.N.Y. 1997) (citation omitted), that analogy to federal law supports the opposite conclusion.

There are several problems with this analysis,[14] but the most glaring is that the Supreme Court itself has found that mere confusion is sufficiently within the public interest to warrant FTC intervention:

> If consumers or dealers prefer to purchase a given article because it was made by a particular manufacturer or class of manufacturers, they have a right to do so, and this right cannot be satisfied by imposing upon them an exactly similar article, or one equally as good, but having a different origin. . . . The result of respondents' acts is that such purchasers are deceived into purchasing an article which they do not wish or intend to buy, and which they might or might not buy if correctly informed as to its origin. We are of opinion that the purchasing public is entitled to be protected against that species of deception, and that its interest in such protection is specific and substantial.

*FTC v. Royal Milling Co.*, 288 U.S. 212, 216-217 (1933). In accordance with that view, the Court has found FTC actions for deceptive conduct related to mundane goods and commodities such as the provenance of wheat flour (*id.*), the amount of wool in underwear (*FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 493 (1922)), or the appropriate name for a species of pine tree (*FTC v. Algoma Lumber Co.*, 291 U.S. 67, 81 (1934)) to be in the interest of the public. Furthermore, the FTC itself has expressed an interest in the deceptive use of endorsements—the conduct at issue here—

---

[14] As an initial matter, it is unclear that importing the FTCA's public interest requirement into Section 349 is appropriate. The FTCA may limit the FTC's enforcement authority to actions that are "in the interest of the public," 15 U.S.C. 45(b), but Section 349 imposes no such limitation on the Attorney General or on private parties. *See* NYGBL § 349(b), (h). Analogizing to the FTCA cases therefore appears to be inappropriate, as the choice to omit that requirement in a statute modeled after the FTCA suggests an intentional choice to omit that barrier. *Accord* Sovern, 52 Ohio St. L.J. at 460 ("[T]he states which borrowed the wording of the FTC Act did not copy the public interest requirement . . . . [therefore the] rather clear implication is that the limitation does not apply to actions under the state statutes, at least not in the way it has been construed by the courts and the FTC.").

regardless of the subject matter. *See*, *e.g.*, 16 C.F.R. §§ 255.0 *et seq*. Thus, the "suggestion that the allegedly deceptive practice must pose some danger to the public health or safety, or have 'significant ramifications' for the public, is simply wrong." *Mitcham*, 204 F. Supp. 3d at 643 (S.D.N.Y. 2016) (Rakoff, J.).

*Fourth*, and finally, this Court agrees with Judge Rakoff that "the elevated requirements that some district courts have apparently engrafted onto the 'consumer-oriented' element of § 349 claims lack a basis in governing New York law." *Id*. (citations omitted). Some New York decisions may have sided with the majority, but they are not persuasive and thus are not strong evidence of how the New York Court of Appeals would rule. *See In re Rezulin Products Liability Litigation*, 178 F. Supp. 2d 412, 414 (S.D.N.Y. 2001) (refusing to follow the precedent set by an unpersuasive intermediate appellate court decision).

To this Court's knowledge, the only New York Courts to address this question are one intermediate appellate court, which has sided with the majority (*see DePinto*, 635 N.Y.S.2d at 217 (N.Y. App. Div. 1995)) along with two trial courts (*see Ivy League Sch., Inc. v. Danick Indus., Inc.*, 999 N.Y.S.2d 797 (N.Y. Sup. Ct. 2014); *The Gameologist Grp., LLC v. N.Y. Div. of Lottery*, 2009 N.Y. Misc. LEXIS 4403, at * 13 (N.Y. Sup. Ct. 2009)). None are persuasive. Each summarily adopted the majority view of federal decisions that themselves wholesale lifted the Givens commentary. Take, for instance, the sum total of the *DePinto* decision's reasoning:

> The IAS Court also properly dismissed the sixth and seventh counterclaims, which purport to allege violations of the New York Consumer Protection Act. Ashley Scott's claims under sections 349 and 350 of the General Business Law are based on theories of trademark infringement and unfair competition, involving the alleged use of confusing labels in the manufacture of women's coats which does not pose a significant risk of harm to the public health or interest. (*EFS Mktg. v Berrie & Co.*, 836 F. Supp. 128, 136, citing

*Bristol-Myers Squibb Co. v McNeil-P.P.C.*, *Inc.*, 786 F. Supp. 182,
215, *affd in part and revd in part on other grounds* 973 F.2d 1033).

*DePinto*, 635 N.Y.S.2d at 217. Those federal decisions rest on the same flawed foundations

discussed above: a belief that general consumer confusion "would not trigger FTC intervention

under 15 U.S.C.A. § 45" and that such confusion "is not within the ambit of 'harm to the public

interest' contemplated by the statute." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 786 F.

Supp. 182, 216 (E.D.N.Y. 1992); *see also EFS Mktg. v. Russ Berrie & Co.*, 836 F. Supp. 128, 136-

7 (S.D.N.Y. 1993) (same). Nothing about these decisions suggests to this Court that the New York

Court of Appeals would agree.

Indeed, as Judge Rakoff illustrated in a well-reasoned opinion, New York Law outside of

those three decisions strongly favors the minority view. *Mitcham*, 204 F. Supp. 3d at 643-4. For

instance, in contexts uninfluenced by federal decisions, New York Courts have recognized that the

purpose of the law is to protect consumers from whatever form deception may take, and have

accordingly interpreted the remedial statute broadly. *Id.* (reviewing state decisions). In one

decision, a New York intermediate appellate court found that a non-consumer plaintiff had alleged

sufficiently consumer-oriented conduct when the deception at issue merely affected the choice of

auto repair shop. *N. State Autobahn, Inc.*, 953 N.Y.S.2d at 102 (N.Y. App. Div. 2012) ("[T]he

complaint alleges that the Progressive defendants . . . misled customers of the plaintiffs and other

independent shops into believing that they must have their vehicles repaired at repair shops that

were members of the [Progressive affiliate program]."). The appellate court went on to say that the

law prohibits "those acts or practices which undermine a consumer's ability to evaluate his or her

market options and to make a free and intelligent choice. In this sense, the deception itself is the

harm that the statute seeks to remedy." *Id.* (citing Mem. of Governor Rockefeller, 1970 N.Y. Legis.

Ann., at 472).

This Court, therefore, agrees with Judge Rakoff. Cases such as *N. State Autobahn, Inc.* more accurately reflect how the New York Court of Appeals would rule than the other federal and state decisions. The imposition of a heightened standing requirement on non-consumer actions lacks a firm foundation in New York's law. Rather, the weight of evidence and logic favors a conclusion that the New York Court of Appeals would disagree with Mr. Givens and the *DePinto* court's summary decision. Consequently, this Court recommends rejecting Defendants' argument that Plaintiffs have pled unviable harms under Section 349 and recommends against dismissing the entirety of Plaintiffs' claims under the law.

### C.  Whether the Statute of Limitations Bars Plaintiffs' Claims.

Defendants also argue that the statute of limitations bars the claims of Plaintiffs Guerra, Koren, and Toth. Mem. ISO at 12-13. Their argument is correct, and Plaintiffs have not offered any response to suggest otherwise. *See* Opp. at 1-16.

Private "rights of action under section 349 are governed by a three-year statute of limitations." *Schandler v. N.Y. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 46322, at *12 (S.D.N.Y. Apr. 26, 2011) (citing C.P.L.R. § 214(2)); *see also Gaidon v. Guardian Life Ins. Co.*, 96 N.Y.2d 201, 209-10 (N.Y. 2001) (Gaidon II) (holding that the six-year statute of limitations for common law fraud does not apply to a claim under Section 349 because it is a statutory cause of action); *Gristede's Foods, Inc. v. Unkechauge Nation*, 532 F. Supp. 2d 439, 452 (E.D.N.Y. 2007) ("Since Gaidon II, New York courts have uniformly applied a three-year statute of limitations to section 349 and section 350 cases."). The private right of action accrues under Section 349 "when plaintiff has been injured by a deceptive act or practice violating section 349." *Schandler v. N.Y. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 46322, at *12 (S.D.N.Y. Apr. 26, 2011) (quoting *Gaidon II*, 96 N.Y.2d at 210). If there is a series of continuing violations, "the continuing wrong doctrine tolls the limitation period until the date of the commission of the last wrongful act." *Palmeri v. Wilkie Farr*

*& Gallagher LLP*, 2017 N.Y. App. Div. LEXIS 9320, at *8 (N.Y. App. Div. Dec. 28, 2017) (citations omitted).

Plaintiffs filed their action on November 23, 2016, meaning that Plaintiffs must allege conduct that occurred no earlier than November 24, 2013. The exhibits containing screenshots of advertisements featuring Plaintiffs Guerra, Koren and Toth, however, exhibit older dates. *See* Dkt. Nos. 1-1 at 18-20, 10-1 at 23-25 (advertisement featuring Plaintiff Guerra was published on November 11, 2013); Dkt. No. 10-1 at 26-28 (advertisements featuring Plaintiff Koren were published on January 17, 2012 and December 3, 2012); *id.* at 29-32 (advertisements featuring Plaintiff Toth were published on February 26, 2012 and December 19, 2012). The complaint does not help them, as it contains no allegations of continuing conduct that occurred more recently. *See* Am. Compl. ¶ 46 (alleging that advertisement featuring Plaintiff Guerra was published on November 11, 2013); *id.* ¶¶ 49-54 (failing to allege any dates of conduct for Plaintiff Koren); *id.* ¶¶ 55-58 (same for Plaintiff Toth).

Ordinarily, a statute of limitations defense is inappropriate on a Rule 12(b)(6) motion as that defense tends to rely on a factual dispute. *See Luv N' Care, Ltd. v. Shiboleth LLP*, 2017 U.S. Dist. LEXIS 128060, at *14-15 (S.D.N.Y. Aug. 8, 2017) (citing *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014)). But "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Id.* That is the case here. The entirety of the allegations contained in the complaint for these three plaintiffs predate the limitations period. This Court, therefore, must recommend dismissal of the Section 349 claims of Plaintiffs Guerra, Koren, and Toth.

### III.    Individual Claims.

Plaintiffs have also named the owner of Summit, Mr. Tricolla, as a defendant. Defendants argue that Plaintiffs have failed to plead that Mr. Tricolla was involved with the alleged conduct and have instead relied on his ownership of Summit Entertainment Corp. to support their claims. *See* Mem. ISO at 13-14.

Defendants correctly point out that an individual is not automatically liable for the violations of the company whose stock he or she owns. *See Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 490-91 (S.D.N.Y. 2011) (citing *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). But Plaintiffs do not rely on such a flimsy theory; they allege that Mr. Tricolla, "in his capacity as principal of Summit, maintains operational control over Gentlemen's Quarters, including all advertising relating thereto." *See* Am. Compl. ¶ 18.

Nevertheless, Defendants argue that these allegations are insufficient. On the one hand, they are correct that an action against an individual defendant must include allegations of individual involvement in some capacity. *See Martal Cosmetics, Ltd. v. Int'l Beauty Exch. Inc.*, 2011 U.S. Dist. LEXIS 95021, at *60-1 (E.D.N.Y. Aug. 23, 2011) (citations omitted). But their argument here mistakes the standard on a motion to dismiss for the standard at other steps in litigation; the cases they rely upon assess the sufficiency of evidence after trial (*see id*. at *3) or the sufficiency of evidence after a motion for default judgment (*see Eu YNo*, 2010 U.S. Dist. LEXIS 99836, at *1-2 (E.D.N.Y. Sep. 8, 2010)). On a motion to dismiss, it is sufficient to simply state that the individual defendant is in control of the operations of the business that has infringed on the trademark. *See Int'l Diamond Imps., Inc. v. Oriental Gemco Ny, Inc.*, 64 F. Supp. 3d 494, 525-26 (S.D.N.Y. 2014) (denying motion to dismiss claims against individual defendant because the plaintiff alleged that the defendant "'is responsible for the control, management, operation, and

maintenance of the affairs of Oriental NY,' and '[t]he acts and wrongful conduct complained of were done with [his] active assistance, cooperation, acquiescence, and procurement, and he derives financial benefit therefrom."). That is what Plaintiffs have alleged. *See* Am. Compl. ¶ 18.

This Court, therefore, does not recommend dismissing Plaintiffs' Lanham Act claim against the individual defendant, Mr. Tricolla.[15]

## IV.    Plaintiffs' Prayer for Punitive Damages.

Defendants also move to dismiss Plaintiffs' request for punitive damages. Mem. ISO at 14-18. They argue that punitive damages are unavailable under the Lanham Act and that Plaintiffs have not alleged conduct sufficient to support punitive damages under Section 349. *Id.*

Regarding the Lanham Act prayer for damages, Defendants are correct. Punitive damages are unavailable under the act. *See Alzheimer's Disease Res. Ctr., Inc. v. Alzheimer's Disease & Related Disorders Ass'n.*, 981 F. Supp. 2d 153, 165 (E.D.N.Y. 2013) (quoting *H & R Indus., Inc. v. Kirshner*, 899 F. Supp. 995, 1011-12 (E.D.N.Y. 1995)).

Plaintiffs try to side step the issue, pointing out that the Lanham Act allows for treble damages. *See* Opp. at 14. But there is a reason treble damages and punitive damages have different names; they are different measures of damages. *See MQDC, Inc. v. Steadfast Ins. Co.*, 2013 U.S. Dist. LEXIS 172444, at \*13-15 (E.D.N.Y. Dec. 6, 2013). Both may attempt to deter conduct by enhancing damage awards for conduct that regularly evades detection. *See Perez v. Z Frank Oldsmobile, Inc.*, 223 F.3d 617, 621-4 (7th Cir. 2000) (Easterbrook, J.). But when a statute

---

[15] Although Defendants do not specifically aim their arguments at Plaintiffs' Lanham Act or Section 349 claims, they only cite to decisions pertaining to the Lanham Act. *See* Mem. ISO at 13-14. Thus, Defendants have not raised an argument about Plaintiffs' Section 349 claim against the individual defendant that may be granted by this Court. *See Tylena M. v. Heartshare Human Servs.*, 2004 WL 1252945, at \*3 (S.D.N.Y. June 7, 2004) (denying motion because the moving party failed to cite any legal authority in support of its application).

provides for a specific multiplier—such as treble damages—federal courts usually interpret that as a Congressional command not to exceed that multiplier. *Id*. at 621-2. Consequently, this Court recommends that Plaintiffs' prayer for punitive damages under the Lanham Act be dismissed.

Regarding Section 349, Plaintiffs have alleged conduct sufficient to support a claim for punitive damages.[16] Taking the operative complaint's allegations as true, Defendants have engaged in a regular policy for years of misappropriating the images of models who are unaffiliated with their strip club. *See* Am. Compl. ¶¶ 19-86. Furthermore, Defendants were on notice of the misappropriation of Plaintiffs' images no later than December 2016 and yet they allowed Plaintiffs' images to remain on their social media pages until at least March 2017. *Id*. ¶ 3. Those allegations support the inference that Defendants acted willfully, which is sufficient for their prayer for punitive damages to survive a motion to dismiss. *See Roy Exp. Co. Establishment of Vaduz v. CBS*, 672 F.2d 1095, 1106 (2d Cir. 1982) (citing *Le Mistral, Inc. v. Columbia Broadcasting System*, 402 N.Y.S.2d 815, 817 (N.Y. App. Div. 1978)) (affirming award of punitive damages for common-law unfair competition and copyright infringement claims because "New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness"). This Court therefore recommends that Plaintiffs' prayer for punitive damages arising under Section 349 not be dismissed.

---

[16] There appears to be some dispute over whether the combined award of actual, treble, and punitive damages may exceed $1,000. *See Bueno v. LR Credit 18, LLC*, 2017 U.S. Dist. LEXIS 145388, at *4-6 (E.D.N.Y. Sep. 7, 2017). Neither party, however, has raised or briefed this issue, so this Court will not consider the question. Nevertheless, the issue may not amount to much, as at least one court in this district has said that "federal courts within the Second Circuit, as well as state courts, have" decided that punitive damages may exceed $1,000. *Id*. (citing *Cohen v. Narragansett Bay Ins. Co.*, 2014 U.S. Dist. LEXIS 134092 (E.D.N.Y. Sept. 23, 2014)).

## CONCLUSION

For the reasons detailed above, this Court recommends: (1) denying Defendants' motion to dismiss Plaintiffs' First Cause of Action for violations of the Lanham Act; (2) denying Defendants' motion to dismiss the Second Cause of Action for violations of New York's General Business Law § 349 for Plaintiffs Mayes, Pepaj, Edmondson, Middleton, and Archuletta; (3) granting Defendants' motion to dismiss the Second Cause of Action for Plaintiffs Guerra, Koren, and Toth; (4) denying Defendants' motion to dismiss the claims against Defendant Tricolla; (5) granting Defendants' motion to strike Plaintiffs' punitive damages request under the Lanham Act; and (6) denying Defendants' motion to strike Plaintiffs' punitive damages request under New York's General Business Law § 349.

## OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 46 (2d Cir. 2002); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

**SO ORDERED.**

/s/ _____
Steven L. Tiscione
United States Magistrate Judge
Eastern District of New York

Dated: Brooklyn, New York
   January 18, 2018